IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MD RETAIL CORP. d/b/a/ MONMOUTH BEACH SUPERMARKET and MS RETAIL CORP. d/b/a SEA BRIGHT SUPERMARKET | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | Civil Action No. 14-6589 (JBS/KMW) |
| v. | **OPINION** |
| GUARD INSURANCE GROUP, | |
| Defendant. | |

APPEARANCES:

Robert Brian Ponziano, Esq.
107 E. Court Street
Doylestown, PA 18901
     Attorney for Plaintiffs

Brandon L. Sipple, Esq.
Jeremiah L. O'Leary, Esq.
Jonathan M. Zagha, Esq.
FINAZZO, COSSOLINI, O'LEARY, MEOLA & HAGER, LLC
36 Cattano Ave., Suite 500
Morristown, NJ 07960
     Attorneys for Defendant

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

In this insurance coverage action, Plaintiffs MD Retail
Corp. (hereinafter, "MD Retail") and MS Retail Corp.
(hereinafter, "MS Retail")(together "Plaintiffs") allege that
Defendant AmGuard Insurance Company (hereinafter, "AmGuard" or
"Defendant") breached its contractual obligation to pay benefits
under a commercial property insurance policy by denying coverage

after Hurricane Sandy caused damage to Plaintiffs' buildings and loss of business income.  Defendant moves for summary judgement because it argues that Plaintiffs lack evidence that any damage occurred and that even if it did occur, such damage was not caused by a covered loss.  Whether various opinions offered by Plaintiffs to support their claimed losses are admissible as expert opinions under Rule 702 of the Federal Rules of Evidence must also be addressed, and the Court convened a <u>Daubert</u> hearing on those issues, as discussed herein.

For the reasons that follow, Defendant's motion for summary judgment will be granted in part and denied in part.

## II.   BACKGROUND[1]

### A. Factual Background[2]

Supermarkets MD Retail and MS Retail, located in Monmouth Beach, New Jersey, are co-owned by Dhiren Amin and Suresh Patel. Defendant issued Policy No. MDBP303727 to MD Retail for the

---

[1] The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

[2] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Plaintiff, as the party opposing summary judgment.  The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), contain improper legal argument or conclusions, or recite factual irrelevancies.  <u>See</u> <u>generally</u> L. CIV. R. 56.1(a); <u>see</u> <u>also</u> <u>Kemly v. Werner Co.</u>, 151 F. Supp. 3d. 496, 499 n. 2 (D.N.J. 2015) (disregarding portions of the parties' statements of material facts on these grounds); <u>Jones v. Sanko Steamship Co., Ltd.</u>, 148 F. Supp. 3d 374, 379 n. 9 (D.N.J. 2015) (same).

period from March 9, 2012 to March 9, 2013, which provided

coverage to MD Retail for direct physical loss of or damage to

their supermarket located at 73 Riverdale Road, Monmouth Beach,

New Jersey 07750. (Def.'s Statement of Material Facts at ¶ 1.)

Defendant also issued Policy No. MSBP304540 to MS Retail for the

period from July 7, 2012 to July 7, 2013 which provided coverage

to MS Retail for direct physical loss of or damage to their

supermarket located at 1160 Ocean Avenue, Sea Bright, NJ 07760.

(Id. at ¶ 2.)  The MD and MS Retail policies both state, in

relevant part:

> Section 1 – Property
> A. Coverage
>    We will pay for direct physical loss of or damage to
>    Covered Property at the premises described in the
>    Declarations caused by or resulting from any Covered Cause
>    of Loss.
>    1. Covered Property
>    Covered Property includes Buildings as described under
>    Paragraph a. below, Business Personal Property as described
>    under Paragraph b. below, or both, depending on whether a
>    Limit of Insurance is shown in the Declarations for that
>    type of property. Regardless of whether coverage is shown
>    in the Declarations for Buildings, Business Personal
>    Property, or both, there is no coverage for property
>    described under Paragraph 2. Property Not Covered.

(Prislupsky Decl., Exs. 1-2.) The Declarations in the MD Retail

policy contained a Limit of Insurance of $650,000 for "Business

Personal Property Coverage," and in May 2012, Defendant issued

an endorsement that added a "Building Coverage Limit" of

$1,600,000. (Id. at Ex. 1; Zagha Cert., Ex. 1.)  As a result, at

the time of Hurricane Sandy, the MD Retail policy insured both

"Buildings" and "Business Personal Property" as Covered Property.

On the other hand, the Declarations for the MS Retail Policy included a Limit of Insurance of $650,000 for "Business Personal Property," but no further endorsement for "Buildings" coverage. (Prislupsky Decl. Ex. 2.) So at the time of Hurricane Sandy, the MS Retail policy insured only "Business Personal Property" as Covered Property.

Both policies contain the following definitions for "Buildings" and "Business Personal Property:"

    a. Buildings, meaning the buildings and structures at the premises described in the Declarations, including:
        (1)  Completed additions;
        (2)  Fixtures, including outdoor fixtures;
        (3)  Permanently installed:
            (a)  Machinery; and
            (b)  Equipment;
        (4)  Your personal property in apartments, rooms or common areas furnished by you as landlord;
        (5)  Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:
            (a)  Fire extinguishing equipment;
            (b)  Outdoor furniture;
            (c)  Floor coverings; and
            (d)  Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;
        (6)  If not covered by other insurance:
            (a)  Additions under construction, alterations, and repairs to the buildings or structures;
            (b)  Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making

4

additions, alternations or repairs
to the buildings or structures.

b. Business Personal Property located in or on the
buildings at the described premises or in the open
(or in a vehicle) within 100 feet of the described
premises, including:

(1) **Property you own that is used in your
business;**

(2) Property of others that is in your
care, custody or control, except as
otherwise provided in Loss Payment
Property Loss Conditions Paragraph
E.5.d.(3)(b);

(3) **Tenant's improvements and betterments.
Improvements and betterments are fixtures,
alterations, installations or additions**

(a) Made a part of the building or
structure you occupy but do not
own; and

(b) You acquired or made at your
expense but cannot legally remove;

(4) Leased personal property which you have
a contractual responsibility to insure,
unless otherwise provided for under
Paragraph 1.b.(2); and

(5) Exterior building glass, if you are a
tenant and no Limit of Insurance is shown
in the Declarations for Building property.
The glass must be owned by you or in your
care, custody or control.

(Prislupsky Decl., Exs. 1 and 2.)(emphasis added)  Both policies

also contain an exclusion for loss or damage caused by water:

B. Exclusions

1. We will not pay for loss or damage caused directly or
indirectly by any of the following. Such loss or damage is
excluded regardless of any other cause or event that
contributes concurrently or in any sequence to the loss.
These exclusions apply whether or not the loss event
results in widespread damage or affects a substantial area.
.   .   .

g. Water

5

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);
(2) Mudslide or mudflow;
(3) Water that bucks up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;
(4) Water under the ground surface pressing on, or flowing or seeping through:
   (a) Foundations, walls, floors or paved surfaces;
   (b) Basements, whether paved or not; or
   (c) Doors, windows or other openings; or
(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph (1), (3) or (4), or material carried or otherwise moved by mudslide or mudflow.

(Id.)  Relatedly, both policies also contained a limitation of coverage for loss or damage to the interior of the buildings caused by certain types of water:

4. Limitations

   a. We will not pay for loss or damage to:

                    .      .      .

      (5) **The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:**
      (a) **The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or**
      (b) The Loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(Id.)(emphasis added). Finally, both policies contain coverage for "Business Income":

   (1) Business Income
      (a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your

6

> "operations" during the "period of restoration." The
> suspension must be caused by direct physical loss or
> damage to property at the described premises. The loss
> or damage must be caused by or result from a Covered
> Cause of Loss. With respect to loss or damage to
> personal property in the open or personal property in
> a vehicle, the described premises include the area
> within 100 feet of the site at which the described
> premises are located.

(Id.)

Following Hurricane Sandy, which occurred in October 2012,
MD Retail and MS Retail submitted insurance claims to Defendant
for alleged damage sustained to their respective supermarkets.
Defendant issued a denial letter to MD Retail on December 19,
2012 and to MS Retail on December 20, 2012 based on both
policies' exclusion for "Water." (Id., Exs. 3, 5.)  On December
28, 2012, Plaintiffs, their public adjuster Robert DeCecco, and
a representative of Defendant inspected a part of the MD Retail
roof that Plaintiffs believed had "dropped due to the storm."
(Zagha Cert., Ex. 4.)  Then, the following month, DeCecco
advised Plaintiffs that they should retain a structural engineer
to opine on the existence of any damage and the cause of such
damage, and that they should obtain an electrical engineer to
inspect the HVAC units "to determine if they were damaged as
well." (Id.)  DeCecco wrote several more letters to Plaintiffs
through September 2013 asking for an update on the status of
Plaintiffs' attempts to obtain structural (for the roof) and

electrical (for the HVAC units) engineering analyses. (Zagha Cert., Ex. 6.)

In a September 20, 2013 letter to Mr. DeCecco, Defendant explained that because there was no evidence that the exterior of the MD Retail building sustained damage as a result of a covered cause of loss, its claim for damage "above the flood line" was unsupported. (Zagha Cert., Ex. 8.) Defendant invited MD Retail to submit any evidence of such damage to support the claim. Id. MD Retail has yet to produce a report, analysis, or other opinion from a licensed structural engineer opining that the roof of its building sustained wind damage in connection with the Hurricane (Def. SMF at ¶ 10.)[3] Additionally, since October 29, 2012, none of the HVAC units at the MD Retail Building that are included in MD Retail's insurance claim to AmGuard have been inspected on MD Retail's behalf by a licensed electrical engineer to determine whether they sustained damage in connection with Hurricane Sandy. (Id. at ¶ 11.)

Mr. DeCecco eventually sent Defendant a $79,000 estimate from S&D General Construction for roof work, a $105,000 estimate from Sagu Construction for interior work, and a $64,000 estimate from Amber Heating & Air, LLC for HVAC replacement and

---

[3] Nor did MD Retail or anyone on its behalf has produced a single photograph that showed damage to the roof following Hurricane Sandy (Def. SMF at ¶ 7.)

associated work. (Zagha Cert., Ex. 9.)[4]  However, Defendant issued another denial letter on November 4, 2013 and explained that it had no evidence of exterior damage as the result of wind (a covered cause of loss).(Prislupsky Decl., Ex. 4.)

Regarding MS Retail, since October 29, 2012, none of the rooftop HVAC units at the MS Retail Building that are included in MS Retail's insurance claim to AmGuard have been replaced. (Id. at ¶ 15.)  Like with the MD Retail building, since October 29, 2012, none of the HVAC units at the MS Retail Building that are included in MS Retail's insurance claim to AmGuard have been inspected on MS Retail's behalf by a licensed electrical engineer to determine whether they sustained damage in connection with Hurricane Sandy. (Id. at ¶ 16.)  Furthermore, neither MS Retail nor anyone acting on its behalf has produced any photographs evidencing any damage to the MS Retail HVAC units (Id. at ¶ 17.) Finally, Defendant has paid MS Retail up to the policy limit regarding alleged damage to awnings and outdoor signage in connection with Hurricane Sandy. (Id. at ¶ 19.)[5]

---

[4] During discovery, MD Retail demanded $145,000 for work performed by E&A Woodworks on the roof, $64,000 for work Amber Heating performed on the HVAC units, and $54,000 in lost business income. (Zagha Cert., Ex. 10.)
[5] During discovery, MS Retail demanded for $34,166.77 for roof and ceiling tile repair, $13,161 for the pylon sign, $6,634 for front molder letters, $9,523 for the front canopy (less $7,500 paid by AmGuard) as well as $60,000 for alleged necessary replacement of the HVAC units on the roof. (Id.)

## B. Procedural History

Plaintiffs filed their Complaint against Defendant on October 23, 2014, asserting two counts of breach of contract for failing to pay for the claims discussed above. [Docket Item 1.] After pretrial discovery, Defendant filed its motion for summary judgment, which included challenges to the admissibility of the opinions of Plaintiff's proposed experts, Carl Brown and Brian Jimenez. [Docket Item 47.][6]  The Court conducted a Daubert hearing on March 7, 2017. [Docket Item 58.][7]

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard, Generally

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted); see also Fed. R. Civ. P. 56(a).

In evaluating Defendant's motion for summary judgment, the Court must view the material facts in the light most favorable

---

[6] Before Defendant filed its motion for summary judgment, Plaintiff filed a motion in limine seeking preclusion of Defendant's presumed expert, Harris Gross. [Docket Item 42.] Defendant has decided not to rely on Mr. Gross's opinion on summary judgment. As a result, as explained in this Court's August 2, 2016 letter to the parties, the Court will dismiss Plaintiff's motion as premature, without prejudice to renewal (if preserved) following entry of the parties' Joint Final Pretrial Order. [Docket Item 46.]

[7] The official hearing transcript is not available, so all hearing citations are to unpaginated notes of testimony.

to the non-moving party, and make every reasonable inference in that party's favor.  See Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). An inference based upon "'speculation or conjecture,'" however, "'does not create a material factual dispute sufficient to defeat summary judgment.'"  Halsey, 750 F.3d at 287 (citations omitted).  Rather, the non-moving party must support each essential element with concrete record evidence.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," the Court may grant summary judgment.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.  DISCUSSION

### A. Admissibility of Plaintiffs' Contractor Affidavits as Expert Opinion

Because Plaintiffs' theory of liability hinges to an extent upon expert testimony (and because the Court may consider only admissible evidence on summary judgment), the Court addresses, at the outset, Defendant's objections to the admissibility of the reports of Plaintiff's proposed experts, Mr. Brown and Mr. Jimenez.  Defendant argues that Plaintiffs' reliance on the Brown and Jimenez Affidavits as "expert reports" to establish the cause of the alleged damage to MD and MS Retail is not valid under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579

(1993). (Def. Br. at 32.)  Plaintiff responds that their
"experience and specialized knowledge" and their "specific level
of involvement with these losses" is sufficient to opine about
the cause of the damage, and "the use of an engineer, while
helpful, is not a requirement under this policy to afford
coverage for the loss." (Opp'n at 10-11.)

Federal Rule of Evidence 702 "embodies a trilogy of
restrictions on expert testimony: [1] qualification, [2]
reliability, and [3] fit." Schneider v. Fried, 320 F.3d 396,
404 (3d Cir. 2003) (citing In re Paoli R.R. Yard PCB Litig., 35
F.3d 717, 741–43 (3d Cir. 1994)); see also Fed. R. Evid. 702.
Rule 702 embraces a "liberal policy of admissibility." Pineda v.
Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting
Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir.
1997)). "Vigorous cross-examination, presentation of contrary
evidence, and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but
admissible evidence." Daubert, 509 U.S. at 596.  While the Third
Circuit embraces a liberal policy of admissibility, a court
still "must examine the expert's conclusions in order to
determine whether they could reliably flow from the facts known
to the expert and the methodology used." In re TMI Litigation,
193 F.3d 613, 665-66 (3d Cir. 1999). "A court may conclude there
is simply too great a gap between the data and the opinion

12

proffered." Id. at 666.  Defendant argues that the Jimenez and Brown Affidavits meet none of the three "trilogy of restrictions" required by the Third Circuit to constitute valid expert opinion.

### 1. Qualifications

The qualification prong of Daubert refers to the requirement that the witness possess specialized expertise.  The Third Circuit has "interpreted the specialized knowledge requirement liberally, and ha[s] stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualification of experts." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)(citing In re Paoli, 35 F.3d at 741)). "[A] broad range of knowledge, skills, and training qualify an expert as such." Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003) (quoting In re Paoli, 35 F.3d at 741).

Carl Brown is a mechanical engineer who is President of E&A Woodworks, LLC and a New Jersey-licensed general contractor who inspected the roof and the interior of the two buildings immediately after Hurricane Sandy, who has worked as a professional contractor for commercial construction within the Monmouth County community "before and after Hurricane Sandy." (Brown Aff. at ¶ 4.)  He received his degree in mechanical engineering from Kean College in 1986, and has been working in

the general contracting business for the past 25 years.  Mr.
Brown has a home improvement contractor's license, which is
required by the State of New Jersey. (Brown Dep. 14:24-25.)
Before the storm, Mr. Brown did some "touch up work" and
"maintenance" to the buildings before the storm. (3/7/17 Hr'g.)
After the storm, Mr. Brown observed the damage to the two
buildings caused by the storm, determined the cause of the
damage to the two buildings, repaired the damage to the roof and
interior at MD Retail and performed remedial work at MS Retail.
(Brown Aff. at ¶¶ 1-3, 6, 9-10.)  Mr. Brown has opined that the
cause of the water damage to the interior of both buildings was
the result of high winds and wind driven rain that damaged the
roof, flashing and shingles (events covered by the policies).
(Id. at ¶ 11.)

     Brian Jimenez is a New Jersey-licensed HVAC technician for
Amber Heating and Air, LLC who inspected the HVAC system on the
roof of each building immediately after Hurricane Sandy.
(Jimenez Aff. ¶¶ 2, 4.)  He graduated from Union County
Vocational-Technical School in 2000 with a degree in HVAC-R and
after working a several companies doing residential and
commercial service, he started his own business five years ago.
Like Mr. Brown, he had a home improvement license during the
time of the Hurricane and the ensuing repairs. (Jimenez Dep. at
19:8.)  Before the storm, he completed "basic maintenance" on

the HVAC units, which included changing the air filters, cleaning the drains, and cleaning the coils.  After the storm, upon request from Mr. Amin, he observed the damage to the two HVAC systems caused by the storm, determined the cause of the damage, replaced the HVAC units at MD Retail and performed remedial work at MS Retail. (Opp'n at 19.)[8]  Mr. Jimenez has opined that the HVAC units on the roofs experienced electric power surges during Hurricane Sandy that caused damage to the systems. (Jimenez Aff. ¶ 9.)[9]  Mr. Brown and Mr. Jimenez performed "routine maintenance" on both buildings before Hurricane Sandy, and noted that the roofs and interiors as well

---

[8] Mr. Brown states that "[i]t is my opinion within reasonable certainty that the approximately 75 mph wind gusts generated during Hurricane Sandy 2012 caused damage to the roof of both Supermarkets. This wind opened the roof and allowed wind driven rain to enter the building through the damaged flashing and shingles causing water damage to the interior of each building above the flood line. I have ruled out other causes of the damage to the roof and water infiltration because to my knowledge there was never a water leakage problem before Hurricane Sandy 2012 and the tearing and lifting damage observed on the two roofs is consistent with approximately 75 mph wind gusts." (Brown Aff. ¶ 11.)

[9] Mr. Jimenez states that "it is my opinion within reasonable certainty that the approximately 75 mph wind gusts generated during Hurricane Sandy 2012 together with electrical power surges caused the irreparable destruction to the HVAC units of both Supermarkets.  I have ruled out other causes of the irreparable damage because to my knowledge the units were operating prior to the storm and the type of damage observed to the wires, circuits, and motors is consistent with wind and wind driven rain damage and power surges." (Jimenez Aff. ¶ 9.)

as the HVAC systems "were in good shape" and "in good working order" before the Hurricane and "there were no roof leaks at either building." (Exs. K and L to Opp'n).

Regarding Mr. Brown, Defendant argues that since he is not a structural engineer, he is "simply unqualified to make such a determination, by his own admission" that wind was the cause of the alleged roof damage. (Def. Br. at 34.)  On the other hand, Mr. Brown's Affidavit states: "I have extensive experience in roofing and I am skilled at recognizing the cause of roof failures and compromises in the residential and commercial setting." (Brown Aff. ¶ 2.)  Plaintiffs also submit an Affidavit from their public claims adjuster, Mr. DeCecco, explaining that "[w]hile [he] suggested that a structural engineer inspect the roof and an electrical engineer inspect the HVAC units at MD Retail, in no way were engineers required in order from MD Retail to qualify for coverage for this loss . . . [Defendant] could have decided to accept coverage on their own or could have consulted with the contractors who performed the repair work." (DeCecco Aff. at ¶ 6.)

Similarly, Defendant argues that Mr. Jimenez is unqualified to provide an opinion that wind or power surge caused damage to any of the HVAC units because he admitted that he is not an electrical engineer (Jimenez Dep. 23:5-13), and he did not have an HVAC contractor's license during the time he claims to have

16

inspected the HVAC units. (Def. Br. at 34.)  Plaintiffs point to
Mr. DeCecco's Affidavit, which states that "an electrical
engineer was not required in order for MS Retail to qualify for
HVAC coverage." (DeCecco Aff. at ¶ 6.)  As a result, they argue
that "[t]here is no one more qualified to discuss the cause,
scope and value of the damage to the HVAC units then (sic) the
HVAC technician who performed the repair work soon after the
loss occurred." (Opp'n at 29.)  Regarding the HVAC contractor's
license, Jimenez testified that he "had a home improvement
license" at the time of his inspections, but did not have an
HVAC contractor's license because New Jersey had "just came out
with it" and he "applied for it –when they came out with the
license . . . [a]nd the state was just so slow at getting them
back to people, it ended up taking two years to get it."
(Jimenez Dep. 20:5, 21-25.)  As a result, Mr. Jimenez's first
HVAC contractors license was valid from August 14, 2015 to June
30, 2016. (Id. at 8-10; see also Ex. 18 to Zagha Cert.)

     The Court finds that Plaintiffs have demonstrated that Mr.
Brown and Mr. Jimenez meet the qualification prong of Daubert.
Defendant provides no support, either in caselaw or in the
insurance policies, for the proposition that testing from a
structural and/or electrical engineer is necessary to meet the
qualification prong of Daubert.  As a result, given the liberal
standard that the Third Circuit employs the Court is

17

sufficiently satisfied that Mr. Brown and Mr. Jimenez have the qualifications necessary to render an expert opinion in this matter.[10]  More specifically, Mr. Brown is qualified to offer opinions as a highly experienced commercial construction manager regarding the cause and extent of roofing and interior damage. He testified to having extensive experience over the past 25 years with the causes and repairs of roofing damage on commercial structures, including the standard types of roods involved on the MD and MS Retail stores in this case.  Mr. Jimenez is less experienced than Mr. Brown, but his training and experience is focused upon HVAC troubleshooting, repair and replacement, and he holds a Master HVAC license.  His experience includes determining the presence and cause of electrical surges and the resulting damage the surge can produce in the HVAC unit. He is qualified to use specialized electrical tests to determine the functioning and useful life of an HVAC system.  While he is

---

[10] Defendants argue that Plaintiffs never served any of the required disclosures pursuant to Rule 26(a)(2)(B), Fed. R. Civ. P, such as statements of compensation, prior publications, and prior testimony. (Def. Br. at 35.)  As a result, they argue that the affidavits are inadmissible to serve as expert opinion regarding the existence or cause of any alleged damage. (Id.) Plaintiffs assert that both contractors "have affirmed reports in conformity with Fed. R. Civ. P. 26(a)(2)(B)." (Opp'n at 24.) The Court has not found any curricula vitae or Rule 26(a)(2)(B) report in the record.  However, the Court finds any Rule 26(a) deficiencies harmless because the necessary disclosures were covered in Mr. Brown and Mr. Jimenez's depositions, as explained in the Daubert hearing.  Neither has testified in court before, published any relevant material, or has been paid to testify.

not an electrical engineer, Mr. Jimenez is sufficiently
qualified to express an opinion as to the cause and nature of
the claimed damage to the HVAC units herein, and any deficiency
in his qualifications goes to the weight of his proposed
testimony.

### 2. Reliability

Next, the Daubert requirement of reliability focuses upon
whether the expert's conclusion rests upon "the 'methods and
procedures of science' rather than on 'subjective belief or
unsupported speculation.'" Calhoun v. Yamaha Motor Corp.,
U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Daubert v.
Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)); see also
Kemly v. Werner Co., 151 F. Supp. 3d 496, 503 (D.N.J. 2015)
(describing the same analytical framework); Krys v. Aaron, 112
F. Supp. 3d 181, 189-90 (D.N.J. 2015) (same).[11]

In certain circumstances, admissible expert testimony may
derive from an expert's knowledge and experience. Oddi v. Ford
Motor Co., 234 F.3d 136, 158 (3d Cir. 2000). Kumho addressed

---

[11] The Third Circuit has provided factors that a trial judge may
consider in determining reliability: 1) whether a method
consists of a testable hypothesis; 2) whether the method has
been subject to peer review; 3) the known or potential rate of
error; 4) the existence and maintenance of standards controlling
the technique's operation; 5) whether the method is generally
accepted; 6) the relationship of the technique to methods which
have been established to be reliable; 7) the qualifications of
the expert witness testifying based on the methodology; and 8)
the non-judicial uses to which the method has been put. In Re
Paoli, 35 F.3d at 742.

the applicability of Daubert to non-scientific experts. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)  In non-scientific cases, such as here, the Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of his testimony." Kumho, 526 U.S. at 150.  Thus, "the relevant reliability concerns may focus upon personal knowledge or experience." Id. at 152.  The objective of Daubert's gatekeeping role, however—"to ensure the reliability and relevancy of expert testimony"—remains unchanged. Id.  In any case, the district court enjoys "considerable discretion" to "determine the criteria for judging reliability under the particular circumstances." Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702.

Defendant argues that neither affidavit contains any discussion regarding the methodologies employed by Mr. Brown and Mr. Jimenez in connection with their causation determinations. (Def. Br. at 34.)  Mr. Brown testified that when he examined MD

Retail after the loss, the ceiling tiles had fallen out of their grids "like sponges," and the flashing had "ripped up" which created an "open hole" that allowed rain to "funnel right into the building." (3/7/17 Hr'g.)  Regarding causation, Mr. Brown stated that he came to the conclusion regarding wind damage because "I knew what was happening. I knew what the winds were. I mean it's no secret that we had anywhere from 75 to 90, 90-mile-an-hour winds at any given time." (Brown Dep. 45:1-7.)  He further stated that "I've been in the business for so long, I'm able to look at something and sort of come to a pretty accurate conclusion of what the cause was." (Id. at 19:10-12.)  As a result, he opined that at MD Retail, the "wind just blew the flashing off the top and opened a funnel into the building." (3/7/17 Hr'g.)

Regarding MS Retail, after the storm, Mr. Brown observed that the ceiling tiles "were like sponges, soaked up a lot of water," with loose and missing flashing on the roof. (Id. at 78.)  He opined that wind caused the flashing and the roof shingles to be misplaced as a result of the storm. (Id. at 79.) Mr. Brown added that regarding methodology, "100 out of 100 contractors are going to look at a roof and if a piece of metal flashing is missing," they'll be able to identify the cause. (Id. at 87.)  He explained that there is "no sophisticated testing that goes on in this case." (Id.)

Defendant argues that Mr. Brown's theory fails to take into account many other possible causes of the building damages, but the argument appears to challenge the persuasiveness of his theory rather than the reliability of it. See, e.g., Heller v. Shaw Indus., Inc., 167 F.3d 146, 156 (3d Cir. 1999)("To require the experts to rule out categorically all other possible causes for an injury would mean that few experts would ever be able to testify.")(internal citation omitted).  The alleged flaws in Mr. Brown's report are more properly the subject of cross-examination at trial, and do not support the wholesale exclusion of this analysis from the factfinder.  The Court therefore finds that the methodology underpinning Mr. Brown's opinion – namely, his familiarity with the properties and examination of them after the storm combined with his extensive roofing and contracting experience – is sufficiently reliable to admit at trial. See Spearman Industries, Inc. v. St. Paul Fire and Marine Ins. Co., 138 F. Supp. 2d 1088, 1098 (N.D. Ill. 2001)(admitting a contractor's testimony that roof damage was solely caused by a winter storm in light of "his practical work experience in various phases of the roofing industry" and the fact that "his opinions are based on his specialized knowledge of roofing and roofing materials.").

Mr. Jimenez opined that "[w]inds of this intensity will cause damage to electrical systems, circuits and motors

22

contained in HVAC units of the type that were on the roof of the two supermarkets," and that the HVAC units had to be replaced "due to extensive damage from Hurricane Sandy's approximately 75 mph wind gusts and wind driven rain." (Jimenez Aff. ¶ 6.)  Mr. Jimenez further explained that he had to replace all HVAC units at MD Retail due to a "power surge," an interruption in electricity that was "recorded and reported through the Monmouth County area during the storm." (Id. at ¶ 7.)  In terms of his methodology, for MD Retail, Mr. Jimenez used a multimeter, tested the resistance on three circuits, and determined that the three HVAC units on the roof of MD Retail had "bad compressors" and needed to be replaced. (3/7/17 Hr'g.)  He inspected the fuses on the units and found that they all had blown, and this likely was the result of excess voltage. (Id.)  He demonstrated through photos of the MD Retail HVAC units (Ex. D-1 at 3/7/17 hearing) the evidence of power surge causing the meltdown of electrical equipment evident after the storm, together with the missing protective panels lost to the winds of the storm.  This power surge "was probably caused by the rain and the crazy winds blowing down power lines." (Jimenez Dep. 100:13-18.)  Defendant argues that Mr. Jimenez's power surge theory fails to take into account many other possible causes of the HVAC unit damage, but again, that argument appears to challenge the persuasiveness of his theory rather than the reliability of it.  Mr. Jimenez

explained that "this is the way to test," and that there is "no other way you're going to do it with that type of compressor." (3/7/17 Hr'g.) Mr. Jimenez then replaced two of the unit himself. (Id.)

Regarding the three HVAC units at MS Retail, Mr. Jimenez explained that after the storm, he observed that they were "inoperable" because there was "no power to them." (Id. at 15.) He employed that same process as he did at MD Retail, using a multimeter to check the compressors, and went through all of the motors, electrical controls to look for burnt wires. (Id. at 30.) He explained how he is able to test the circuitry of the HAC units even when there is a loss of external power by using his multimeter, as he testifies he did in this case. He opined that electrical damage caused by power surges (caused by the Hurricane) caused damage to the MS Retail HVAC units. Mr. Jimenez recommended replacing the units, but does not believe they have been replaced yet.

The Court finds that Plaintiffs have sufficiently demonstrated that the causation opinions of Mr. Brown and Mr. Jimenez are reliable under Kumho. As discussed above, Mr. Brown and Mr. Jimenez have both explained these methodologies of testing and observation at the Daubert hearing. These methods are the standards used by roofing and HVAC experts in the field, they are relied upon in advising commercial property owners and

24

managers concerning repair and replacement of roofing and HVAC systems, and they are capable of being replicated.[12]  The Court is satisfied after a <u>Daubert</u> hearing that their knowledge and experience with the properties combined with their credible testing methods, although relatively basic, demonstrate that their opinions are reliable regarding not only the scope and value of the damage to MD and MS Retail, but also regarding the cause of the damage. <u>See</u> <u>Dinker v. Nationwide Mut. Ins. Co.</u>, No. 10-315, 2013 WL 6813900, at *3 (S.D. Tex. Dec. 23, 2013)(admitting expert's testimony regarding cause-of-loss because he "used well-accepted methods that meet minimum standards of reliability").

### 3. Fit

Finally, the "fit" requirement is based upon the text of Rule 702, which requires that an "expert's scientific, technical or other specialized knowledge . . . help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  To be helpful, expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." <u>United States v. Schiff</u>, 602 F.3d 152, 173 (3d Cir. 2010)(quotation marks and citation omitted).  Conversely, "expert evidence which does not relate to

---

[12] As Mr. Brown testified regarding replication, "100 out of 100 roofing contractors will identify the problem as the missing flashing." (3/7/17 Hr'g)

an issue in the case is not helpful." United States v. Ford, 481
F.3d 215, 219 n.6 (3d Cir. 2007) (quotation marks and citation
omitted). "The standard is not that high, 'but is higher than
bare relevance.'" Schiff, 602 F.3d at 173 (citation omitted).

Defendant argues that the proffered testimony does not fit
within the facts of the case because their reference to YouTube
videos include "no explanation as to how the videos are relevant
to the unexplained testing or methodologies employed." (Def. Br.
at 35.)  Furthermore, the weather reports and new articles "bear
no indication as to why they are specifically relevant to
determining the cause of any alleged damage." (Id.)  Plaintiffs
reply that the opinions, reflected in their affidavits and
testimony, "focus only on what they have done or seen during the
many phases of these claims," so their findings would certainly
assist a jury in determining the nature and cause of the various
damages. (Opp'n at 33.)  The Court finds that Plaintiffs have
clearly satisfied the fit requirement, as Mr. Brown and Mr.
Jimenez's familiarity with the properties, the damage and the
repairs, as expressed in the Daubert hearing, would certainly
aid the jury.

Given the Third Circuit's liberal policy on expert
admissibility and the Court's thorough analysis of the
contractors during the Daubert hearing, the Court finds that the
Brown and Jimenez Affidavits are admissible under Rule 702,

regarding the scope and value of the damages, as well as causation.   Therefore, the Brown and Jimenez Affidavits will be considered as part of Plaintiff's opposition to summary judgment.

### B. Defendant's Motion for Summary Judgment

Moving on to the merits, Defendant argues that Plaintiffs do not have competent evidence, such as photographs, reports or expert opinion establishing a genuine factual dispute regarding both (1) the existence of damage to covered property; and (2) that the cause of the alleged damage was the result of a covered cause of loss as required by the at-issue insurance policies.

The interpretation of an insurance contract is a question of law for the court to determine, and can often be resolved on summary judgment. Weedo v. Stone-E-Brick, Inc., 155 N.J. Super. 474, 479 (App. Div. 1977), rev'd on other grounds, 81 N.J. 233 (1979).   In coverage disputes, the insured party has the burden "to bring the claim within the basic terms of the policy." Reliance Ins. Co. v. Armstrong World Indus. Inc., 292 N.J. Super. 365, 377 (App. Div. 1996).   The burden then shifts to the insurer to show that a loss is otherwise excluded by an applicable exclusion, such that the damages claimed are not covered. Flomerfelt v. Cardiello, 997 A.2d 991, 997-98 (N.J. 2010). "Exclusions are presumptively valid and will be given effect if specific, plain, clear, prominent, and not contrary to

27

public policy." <u>Colliers Lanard & Axilbund v. Lloyds of London</u>, 458 F.3d 231, 236 (3d Cir. 2006).  For purposes of obtaining summary judgment, defendant's burden is to show that, factually, plaintiff has failed to meet its prima facie case, <u>Bilotti v. Accurate Forming Corp.</u>, 188 A.2d 24 (N.J. 1963), or that as a matter of law, defendant has demonstrated the applicability of an exclusion, thereby negating coverage.  We consider the two properties separately.

### 1. MD Retail's Claim for Roof Repairs, Interior Repairs Above the Flood Line, HVAC Replacement, and Rental Payments

MD Retail claims that Defendant owes it $145,000 for roof and interior damage repairs, $64,000 for HVAC repairs, and $54,000 for rental expenses.  The Court examines the record supporting each claim in turn.

### a. Roof Repairs

Defendant first argues that neither MD Retail, its public adjuster Robert DeCecco, nor Mr. Brown have a single photograph of the roof following the Hurricane that even suggests that the roof was damaged. (Def. Br. at 28.)  Additionally, it argues that Plaintiffs have no evidence as to the cause of the alleged sinking roof – whether by water, wind, roof defect, negligent work, etc. (<u>Id.</u> at 29.)  As a result, they argue, there is no genuine issue of material fact regarding roof damage.

Plaintiffs respond that roof damage is a covered cause of

loss under Section (A)(1)(a) of the policy and point to language
from Mr. DeCecco's January 5, 2013 letter to Plaintiffs
documenting a December 2012 inspection where they all "went up
to the roof area where [Plaintiffs] showed the adjuster a
section of the roofing system that [they] indicated had dropped
due to storm." (Ex. 4 to Zagha Cert.)   Mr. Brown also explained
that upon visiting MD Retail after the storm, he noticed that
"[h]alf of the metal flashings, which sort of seal up those
edges along those perforations, were actually gone, just blown
off," which lead to "compromised . . . roof perforations."
(Brown Dep. 29: 3-7.)   Upon inspection, Mr. Brown could
"actually see into the interior of the store." (Id. at 32:22-
23.)   Additionally, Plaintiffs submitted November 28, 2012
photographs that Donald Michels, Defendant's Field Inspector,
took of the water-damaged ceiling tiles and upper walls. (Exs. B
and C to Pl.'s Opp'n).[13]   More generally, Plaintiffs argue that
"it was reasonable for Mr. DeCecco and the contractors to rely
on AmGuard's inspectors to document what they and everyone else
had observed while examining the roof," so Plaintiffs "should
not be penalized for not doing the work of the insurer if

---

[13] Notably, while many of Mr. Michels' pictures include the
damaged interior of MD and MS Retail, they do not include any of
the roof. Plaintiffs do submit one picture of MS Retail's roof,
dated November 9, 2012. (Exs. E and F to Opp'n.)

AmGuard now argues the damage and repairs were not adequately documented." (Opp'n at 10, 25.)

Given the above evidence, the Court finds that there is a genuine dispute of material fact regarding roof damage at MD Retail.  New Jersey law is clear that the plaintiff bears the burden of establishing that a loss occurred within the coverage of the insurance contract before the burden shifts to the insurer regarding the applicability of any exclusions. Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co., 483 A.2d 402 (N.J. 1984); see also Building Materials Corp. of America v. Allstate Ins. Co., 424 N.J. Super. 448, 464-65 (App. Div. 2012)("If the insured offers sufficient credible evidence to establish a prima facie loss within the coverage of the policy, the burden of proving that the loss falls within the exclusionary provisions of the policy shifts to the insurer.")(collecting cases).  Here, Plaintiff has met its burden, through eyewitness testimony as to the condition and damage to this MD Retail roof, and the Affidavit and causation testimony of Mr. Brown, as Mr. Brown states "[t]he wind driven rain that entered the building through the opening in the roof caused extensive damage throughout the upper portion of the building above the flood line.  The extreme wind gusts generated during Hurricane Sandy 2012 caused the metal flashing members on the roof to be ripped up." (Brown Aff. at ¶ 9.)  Mr. Brown was

familiar with the MD Retail property both before the storm and after the storm, and his testimony on scope of the damage and causation leads the Court to deny motion for summary judgment regarding MD Retail's roof damage.  Notwithstanding various weaknesses in Plaintiff MD Retail's proofs, which will undoubtedly be exposed at trial, a reasonable jury, giving the Plaintiff the benefit of reasonable inferences, could find for Plaintiff on this claim.

### b. Interior Repairs

Next, regarding MD Retail's claim for interior damage above the flood line, Defendant argues that Plaintiffs have put forth no photographs depicting the existence of a wind-created opening in the roof that caused interior damage above the flood line. (Id. at 29.)[14]  Defendant also argues that MD Retail has no evidence to support its contention that "rain," as opposed to wind-driven sea water or flood water, entered the building from the roof to cause interior damage above the flood line. (Id. at 29.)  Defendant argues that this distinction matters because the policy only provides coverage for rain entering the interior

_____

[14] According to Mr. DeCecco, items damaged above the flood line (at both buildings) include the "ceiling tiles and grid, the lighting and electrical wiring and upper walls damaged by rainwater that entered through the damaged roof." (DeCecco Aff. ¶¶ 2-3.)  Furthermore, Mr. Brown explains that his repair work included "all damaged ceiling tiles, insulation, lighting and electrical wiring." (Brown Aff. at ¶ 9.)

through a breach in the exterior, but not sea or flood water. (<u>Id.</u> at 9, 29.)[15]

Plaintiff MD Retail argues that interior damage is covered under Section (A)(b)(1) & (3) of its policy, and that the owners and their contractors are not required to take photographs of the roof or interior before making repairs. (Opp'n at 12.) In addition to the testimony of Mr. Brown, who personally observed to MD Retail after the storm and found that the ceiling tiles were "falling out of the grids" and looked like "sponges" (3/7/17 Hr'g), Plaintiff provides photographs of the damaged interior and ceiling that Mr. DeCecco took before and during repairs. (Ex. D to Pl.'s Opp'n), as well as pictures of the damaged interior and ceiling that Rick Harris, one of Defendant's claim adjusters, took on November 9, 2012. (Ex. I to

---

[15] Here, Plaintiff MD Retail denies Paragraph 9 in Defendant's Statement of Material Facts, which states that "MD Retail has no evidence that rain, as opposed to wind-driven sea water or flood water, entered the building from the roof to cause interior damage above the flood line." However, Plaintiff's reasoning does not reference any affidavits or other documents and thus fails to dispute the fact for purposes of the Motion. Local Civil Rule 56.1(a) requires that the opponent to summary judgment dispute a fact furnished by the movant by citing to affidavits and other documents. Where record citations are not included and are not readily apparent, a party's factual assertions may be disregarded. <u>See, e.g.</u>, <u>Webster v. Dollar General</u>, 197 F. Supp. 3d 692, 696 n.5 (D.N.J. 2016)("The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), recites factual irrelevancies, and/or recounts information that the Court struck from the summary judgment record.")

Pl.'s Opp'n.)  Specifically, Mr. Harris took three photographs
from MD Retail's storage room noting water damage from the roof,
and three photographs from the main room showing damaged ceiling
tiles from "roof leaking water." (Id.)  Mr. Harris also took
several photographs from MS Retail's main room and bathroom
labelled "staining from roof water leaking," "water damaged from
ceiling leaking," and "water damage to ceiling and walls from
leaking roof." Id.

The Court finds that MD Retail has put forth sufficient
evidence to create a genuine issue of material fact on the issue
of interior repairs.  In addition to Mr. Brown's expert
testimony, there are several photographs in the record showing
extensive damage to the interior of the building above the high
water mark of the flood line.  While Defendant relies on the
"Water" exclusion, arguing that Plaintiff presents no evidence
that rain, as opposed to wind-driven sea water or flood water,
entered the building from the roof to cause interior damage
above the flood line, as explained previously, the burden is on
the insurer to prove that the loss falls within an exclusion.
Defendant has presented no evidence that it was sea water or
flood water that entered through the roof to cause interior
damage.  At a minimum, Plaintiff is entitled to the reasonable
inference that water damage to ceilings and walls flowed down
from the visible roof openings, and not upward from any flood

waters.  As a result, the Court denies summary judgment on interior repairs.

### c. HVAC Repairs

Next, Defendant argues that MD Retail's $64,000 claim for replacement of its rooftop HVAC units is unsupported because (1) the units were approaching the end of their life expectancy before the storm, (2) the units "were never inspected by a licensed electrical engineer to determine whether they sustained damage in connection with the storm," and (3) even if the units were damaged from the storm, MD Retail "has not proffered competent evidence as to whether the units were damaged by a covered cause of loss." (Def. Br. at 30.)  MD Retail argues in response that the HVAC repairs are covered under Section (A)(b)(1) and (3) of their policy, and offer Mr. Jimenez's eyewitness testimony and Affidavit and photographs (Ex. D-1 at 3/7/17 hearing) as support.  Mr. Jimenez opined that the HVAC units had "at least an additional 10 year life expectancy" at the time of the Hurricane, and provided several photographs of the HVAC units before and after the Hurricane showing severe damage to the units. (Exs. F and L to the Opp'n; Ex. D-1)  He has opined that the high winds from the Hurricane knocked down power lines, which caused a power surge, thereby causing irreparable damage to the HVAC units. (3/7/17 Hr'g.)  Defendant argues that Plaintiff provides no evidence that the HVAC repairs

34

at MD Retail would escape the "Water" exclusion, but the burden
is on the insurer to establish that, and they have not done so.
As a result, summary judgment is denied as to the HVAC damage at
MD Retail.

### d. Rental Payments

Finally, Defendant argues that MD Retail cannot support its
claim for rental payments and lost business income because the
cause of such damage was due to an excluded cause of loss –
flooding. (Id. at 30.)  Plaintiff MD Retail argues that Rental
Payments are covered under Section (A)(5)(f), and submit an
affidavit from their accountant, Sunil J. Shah, CPA, explaining
that MD Retail was "unable to conduct business from the date of
Hurricane Sandy on October 29, 2012 until the date of
restoration on August 2, 2013." (Shah Aff. at ¶ 4.)  As a
result, Plaintiff asks for $54,000, which covers rental expenses
from November 2012 until July 2013 at $6,000 per month. (Id. at
¶ 5.)  Plaintiffs further argue, but without support, that the
"[f]lood damage part of the loss was cleared out and repaired
relatively quickly compared to the roof and ceiling," so they
are entitled to compensation for the loss in lease income during
the period of restoration of the roof and ceiling. (Opp'n at
15.)  The record shows that MD Retail was flooded for months
after the Hurricane, but flooding is an excluded cause of loss
pursuant to the policy's "Water" exclusion.  Given that

35

Defendant has met its burden that the exclusion applies, and Plaintiff has put forth no evidence explaining whether flooding or something else caused a loss in business income, the Court grants summary judgment on this claim.[16]

### 2. MS Retail's Claim for Roof Repairs, Interior Repairs Above the Flood Line, and HVAC Replacement

MS Retail claims that Defendant owes $34,166.77 for interior damage repairs, $60,000 for HVAC repairs, and $29,318 in awning and outdoor sign repairs.  Roof repairs at MS Retail are no longer at issue.[17]

### a. Interior Repairs

Defendant argues that Plaintiff MS Retail's claim for interior damage above the flood line is unsupported because even if such damage occurred, it does not constitute damage to

---

[16] Plaintiffs also deny Paragraph 12 in Defendant's SMF, which states "MD Retail was closed for business for approximately nine months, due to necessary repairs caused by approximately four feet of flooding following Storm Sandy."  Again, however, Plaintiffs fail to support this statement with a record citation.  The Court therefore deems the facts in Paragraph 12 uncontested. See McCann v. Unum Provident, 921 F. Supp. 2d 353, 358-359 (D.N.J. 2013)("failure to reference evidence of record demonstrates that there is no reason to disbelieve" facts as set forth by adversary").

[17] Defendant argues that MS Retail's claims for roof repairs are unsupported because it is indisputable that the MS Retail Policy only provided coverage for "Business Personal Property" and not "Buildings," and that Plaintiffs' landlord, Scot Bell, confirmed that he was responsible for roof repairs. (Def. Br. at 30.) Plaintiffs concede that "MS Retail does not have a claim for the roof and shingle damage," so the Court will grant Defendant's motion for summary judgment regarding MS Retail's roof damage. (Opp'n at 17.)

"Covered Property" insured by the MS Retail policy, which only covers "Business Personal Property" and not "Buildings," as previously described. (Def. Br. at 31.)[18]  Plaintiff MS Retail argues in response that the interior damage is covered under Section (A)(b)(3)("Business Personal Property") of their Policy because "all damaged items were either purchased and installed by MS or acquired by MS Retail." (Opp'n at 17.)  MS Retail presents evidence from the November 22, 2012 report of Rick Harris from Pacesetter Claims Service, noting that "[i]nterior water damage to the ceiling tiles, paneling, drywall, and paint on the upper walls do (sic) to the water entering from the roof because of wind damage to shingles, which is covered in this policy." (Ex. I to Opp'n.)  MS Retail also attaches the affidavit of Mr. Brown, which describes the interior damage at MS Retail as including the ceiling grid, ceiling tiles, drywall, fluorescent strip lights and acoustic grid fixtures. (Brown Aff. at ¶ 10.)

MS Retail's evidence on interior repairs is sufficient to create a genuine issue of material fact, as there is evidence in the record that damage to portions of MS Retail's ceiling and lights would be considered "Business Personal Property" instead

---

[18] It is undisputed that MS Retail did not have the endorsement for "Buildings" that MD Retail had. (Zagha Cert. ¶ 1.)

of the not-covered "Buildings" portion of their policy.[19]   A
policy is deemed ambiguous under New Jersey law if the "phrasing
of the policy is so confusing that the average policyholder
cannot make out the boundaries of coverage." Weedo v. Stone-E-
Brick, Inc., 81 N.J. 233, 247 (1979). "Business Personal
Property" is defined in relevant part as: (1) property you own
that is used in your business; (2) property of others that is in
your care, custody or control, and (3) tenant's improvements and
betterments - improvements and betterments are fixtures,
alterations, installations or additions (a) made a party of the
building or structure you occupy but do not own; and (b) you
acquired or made at your expense but cannot legally remove."
(Id.)

     In addition to the ambiguity of the policy, the Harris
report stating that the various items are covered by the policy
along with the portions of Mr. Bell's Affidavit stating that MS
Retail "is the owner of the interior suspended ceiling grid and
suspended ceiling tiles, paneling, drywalls and paint,
fluorescent strip lights and acoustic grid fixtures" is
sufficient to create a genuine issue as to interior damage
coverage. (Bell Aff. ¶ 4).  A fixture is defined as "personal

---

[19] The definition of "Buildings" in the MS Retail policy includes
(1) completed additions; (2) fixtures, including outdoor
fixtures; and (3) permanently installed machinery and equipment.
(Prisulupsky Decl. at ¶ 2.)

property that is attached to land or a building and that is regarded as an irremovable part of the real property, such as a fireplace built into a home." Fixture, BLACK'S LAW DICTIONARY (10th ed. 2014.)  The above items could be covered as Business Personal Property under "property you own that is used in your business" as well as "fixtures, alterations, installations or additions made a part of the building or structure you occupy but do not own."  Certainly ceiling tiles and fluorescent strip were made a part of the building that MS Retail occupied but did not own.  Given these factual disputes regarding the classification of the various damaged items as "Business Personal Property," the Court denies summary judgment on this claim.

**b. HVAC Repairs**

Defendant next argues that MS Retail's claims for replacement of the HVAC units is unsupported because there is no evidence that the HVAC units are damaged, as the units were still in operation as of January 2016, over three years since the storm. (Def. Br. at 31.)  Additionally, it argues that MS Retail has no photographic evidence of the damage, the units were never inspected by an electrical engineer, and there is no evidence that the units were damaged by a covered cause of loss. Finally, it argues that the lease agreement between MS Retail

and Mr. Bell requires Bell to pay for the damage to the HVAC units. (Ex. J to Opp'n.)[20]

The Court agrees with Defendant that MS Retail has submitted no evidence that the HVAC units were damaged.  MS Retail admits that it has no photographic evidence depicting any damage to the HVAC units (Pl.'s Response to Def. SMF at ¶ 17), and that the HVAC units are still in service today. (Id. at ¶ 15.)  Although Mr. Jimenez states that the units "were functioning properly prior to Hurricane Sandy," and "[u]pon examination of the HVAC units" after the Hurricane, he "noticed that none of the units were functioning properly and have to be replaced." (Jimenez Aff. ¶ 8,) he has not in fact inspected these units since power was restored to the building to learn that they are actually functioning.  Mr. Jimenez added that the "existing HVAC units have to be replaced due to extensive damage from Hurricane Sandy's approximately 75 mph wind gusts and wind driven rain." (Id.)  But Mr. Jimenez retracted his opinion that the wind caused damage to the MS Retail HVAC units, as discussed below.  His understanding is that none are working now (Id.;

---

[20] Regarding this last argument, Mr. Bell explains that MS Retail "is responsible for the maintenance, repair and/or replacement of all [HVAC] Units."[20] (Bell Aff. ¶ 4.) Defendant essentially concedes this argument in its Reply Brief, and, assuming MS Retail can prove damages at trial, HVAC unit damage would be covered as "Business Personal Property."

3/7/17 Hr'g) is likewise not admissible because it has no basis;
the parties agree that these HVAC units are working now.

At the Daubert hearing, Mr. Jimenez clarified that he saw
no evidence of wind damage to the MS Retail HVAC units, and that
he agrees with the statement that "it is fair to say that the
units at MS Retail did not suffer any wind damage." (3/7/17
Hr'g.)  It further became clear that these HVAC units are
functioning today despite having no repairs since the storm, and
that Mr. Jimenez was unaware of that crucial fact when he
submitted his Affidavit containing a contrary opinion that these
units were "irreparable." (See Jimenez Aff. ¶¶ 8-9.)  Likewise,
his statement in his Affidavit that "[t]he condition of the
wires, circuits and motors of the HVAC units was consistent with
power surge damage" and that the units are "irreparable" (Id. ¶
8), which is identical to her verbiage as to the MD Retail HVAC
damage (Id. ¶ 7 and attached photos), has no support in the
record.  Plaintiff MS Retail has produced no evidence regarding
any storm-caused damage to MS Retail HVAC units affecting their
operability after power was restored and continuing to the
present day.  Mr. Jimenez is not competent to offer such
testimony since his last visit to MS Retail was in 2012 in the
immediate aftermath of the storm and he has not returned since.
(3/7/17 Hr'g.)

In summary, there is no material dispute of fact regarding
the continued operability of the MS Retail HVAC system, and no
reasonable jury could find for Plaintiff MS Retail on this
issue.  Summary judgment will be granted in favor of Defendant
dismissing MS Retail's claimed loss of HVAC units.

### c. Awning and Outdoor Signage Repairs

Finally, Defendant argues that Plaintiff's claims for
awnings and outdoor signage repairs are unsupported because
Defendant already paid the claim up to the policy limit.  MS
Retail responds that the November 22, 2012 Pacesetter Claims
Service report states that the policy limit for outdoor signage
and awnings is $30,000, but this contradicts the actual policy,
which states that the limit is $7,500. (Ex. I to Opp'n.)  MS
Retail even admits in its Response to Defendant's SMF that
Defendant paid MS Retail the policy limit regarding alleged
damage to awnings and outdoor signage. (Pl.'s Response to Def.'s
SMF, ¶ 19.)[21]  Given that MS Retail was already paid the $2,500
limit of insurance for awnings damage and $5,000 limit of
insurance for outdoor signs, there is no dispute that the

---

[21] Plaintiff complains that Defendant "cherry-picked" portions of
deposition transcripts to present in its summary judgment
motion, thereby "distort[ing] the true meaning of the testimony
and the scope of the opinions." (Opp'n at 21 n.3). Nothing in
Rule 56 prevented Plaintiff from attaching other portions of the
various deposition transcripts to its Opposition, but it has
failed do so. As a result, the Court declines to hold
Defendant's motion "insufficient, incomplete and misleading."
(Id.)

applicable policy limits have been paid and the Court grants

summary judgment on these claims. (Def. Br. 23-24, 32.)

## V.    CONCLUSION

In sum, the motion for summary judgment will be granted in

part and denied in part.  The accompanying Order will be

entered.


**March 27, 2017**                    **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      Chief U.S. District Judge